James Lee GUNTER, Appellant,

v.

The STATE of Texas, Appellee.

No. 69,812.

Court of Criminal Appeals of Texas, En Banc.

March 10, 1993.

Rehearing Denied May 12, 1993.

Robert A. Scardino, Jr., Houston, Larry P. Urquhart, Brenham, for appellant.

John B. Holmes, Jr., Dist. Atty., J. Harvey Hudson, Glenn Totschall and Bert Graham, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for State.

## OPINION

WHITE, Judge.

In a four count indictment appellant was accused of the offense of capital murder under V.T.C.A. Penal Code, § 19.03(a)(2). The indictment alleged alternatively that appellant intentionally caused the death of Ruth Deanda in the course of committing and attempting to commit the offenses of burglary, robbery, kidnapping and "aggravated sexual abuse." Prior to submission of the case to the jury the State abandoned the "aggravated sexual abuse" theory of the offense. The trial court authorized the jury to convict under theories that appellant intentionally murdered Deanda in the course of committing or attempting to commit either burglary, robbery or kidnapping. Lesser included offenses of murder, burglary of a habitation, voluntary and involuntary manslaughter were also submitted. In a general verdict the jury found appellant guilty of capital murder. See Article 37.07, § 1(a), V.A.C.C.P. In accordance with affirmative answers to special issues, the trial court assessed punishment at death. Article 37.071, (e), V.A.C.C.P. Appeal is automatic to this Court. *Id.*, (h).

### I.

In his first point of error appellant alleges the evidence is insufficient to support the jury's verdict. Specifically, he contends that the evidence does not establish beyond a reasonable doubt that the murder of Deanda was perpetrated in the commission or attempted commission of any of the three underlying felonies submitted to the jury in the court's charge.

### A.

The State produced the following evidence at trial:

#### Phone Calls at Work

Pam Knox testified that in January and February of 1986, she and Ruth Deanda worked together as clerks at a convenience store in Houston. Sometime during the second week of February of 1986, a caller who identified himself as "Lee" spoke with Deanda. According to Knox, Deanda seemed reluctant to speak with "Lee" and ended her conversation by telling him that she was "involved with someone else and that she couldn't be involved with him at the time and she wished he would just leave her alone." "Lee" called back again ten minutes later and Deanda spoke briefly

with him. A couple of days later, Deanda told Knox that Lee Gunter had again called her at work and that he had been "pestering her and her girlfriend, Marylou [Lopez]." Deanda instructed her fellow employees to tell future callers other than her mother that Deanda was not there.

On Friday, February 21, 1986, Knox arrived at the convenience store at about 10 p.m. as Deanda was finishing her shift. According to Knox, Deanda planned to meet someone at her apartment, and she "implied it was a male, and she was real happy, real excited." Deanda did not tell Knox whom she was meeting. Other testimony indicated that Deanda was dating a man named Steve, and that she left a club called Roper Bill's between 11:00 and 11:30 p.m. that Friday night to meet Steve at another club called Struts.

### Friday Night

Appellant, who was 20 years old, and his 17–year–old companion, "Chachi" Medina, had been staying with Cheryl Bond at her apartment. On Friday, February 21, 1986, appellant drove Bond, with whom he was romantically involved, to work in her Ford Fairmont. Appellant picked Bond up after work at 9 p.m. that Friday and returned to her apartment. At about 11 p.m., Medina wanted to go home. Bond gave appellant the keys to her car so that he could take Medina home, and then fell asleep on the couch.

### Saturday Morning

At about 1:20 a.m. Saturday morning, appellant returned to Bond's apartment with a ceiling fan in its box and a radio. According to Bond, appellant said that a man wanted to buy the ceiling fan and asked Bond for permission to use her car again. Bond consented and appellant left her apartment again at about 1:40 a.m. Appellant returned to Bond's apartment at about 3:40 a.m., telling Bond that he was "in trouble." According to Bond, appellant said that he had gotten into a fight at "Babba Boy's" grocery store, had stabbed someone, and "that the guy was hurt pretty bad and he showed me ... a guy's

driver's license" with the name "Leroy Seymour" on it. Appellant showed Bond blood on his shoes and again told Bond that "the guy was hurt pretty bad." Appellant had a sheathed four-inch pocket knife on his belt which he was known to wear habitually.

Bond asked about her car and appellant told her that the car was parked on the other side of the building. When Bond started to go out to her car, appellant asked her to wait and left. Bond waited a moment, then followed appellant out to the parking lot where she observed him getting out of a small Chevrolet. When Bond asked about her own car, appellant told her "my car was all right or he didn't get me in any trouble." He said the Chevrolet belonged to Leroy Seymour. He told Bond her car was at Babba Boy's, and that he would take her there once he was able to start the Chevrolet.

Appellant went to one of Bond's neighbors and gave him five dollars to help jump-start the Chevrolet. After unsuccessful attempts to start the car with the use of jumper cables, the neighbor suggested they push the car out of the complex onto Lee Road. They hand-pushed the car onto a street perpendicular to Lee Road and appellant eventually steered the Chevrolet into the driveway of an abandoned house close by. Appellant asked the neighbor to tell Bond that he would see her later. When appellant failed to return, Bond called the police and reported that her car had been stolen.

### Sunday Evening

Bond went to work later that day, on Saturday, and on Sunday she walked around the neighborhood looking for her car, a Ford Fairmont. At dusk on Sunday, Bond saw the Chevrolet parked in the driveway of the abandoned house, on Delmack Street. Bond went home and again called the police.

### Monday Morning

Deputy Shaver of the Harris County Sheriff's Department met Bond at about 2 a.m. Monday morning and went to the house on Delmack Street where the Chev-

rolet was parked. Shaver discovered the car was registered to Ruth Deanda, eventually tracing her to an address on Benmar. After a fruitless run by "Babba Boy's" grocery store in search of Bond's car, Bond and Shaver then proceeded to the Benmar apartment, where they found Bond's Ford Fairmont.

In the trunk of the Fairmont, Shaver found a pillowcase containing packaged frozen pot pies and ground beef. Bond observed the boxed ceiling fan in the passenger compartment of her car and an atlas in her trunk. None of these items were hers.

Deputy Shaver and Sergeant Enloe, who had been requested on the scene, investigated the apartment. They observed the window near the door lock had been broken. Fingerprints on the broken glass were later found to match appellant's. Knocking on Deanda's door and receiving no answer, they tried the doorknob, but the apartment was locked. After the apartment manager unlocked the door, the officers searched the apartment. The fan in the bedroom was still on, the lights had been turned off, and the entire apartment appeared undisturbed.

Later that morning Deanda's body was discovered face down in a clearing in the woods close to the abandoned house on Delmack. Her bra strap was still fastened, but her bra had been pulled up above her breasts. Her knee-length stockings were partially pulled down, and her shorts and panties were wadded around one of her ankles.

### Appellant's Tuesday Night Confession to Bond

Between 9:30 and 10:00 p.m. on Tuesday night, Bond was startled to find appellant waiting for her in her apartment. According to Bond, appellant told her, "Cheryl, don't be scared. I would not hurt you for anything in the world." He raised up his hands and asked her if she would like for him to give her his knife. She told him, "just don't touch the knife and everything will be alright." Appellant told her he wanted to talk to her, that he wanted her

to know what happened, and that he did not care what anybody else thought.

Bond asked him whether he "raped the girl," and appellant said "no." Appellant again told Bond he wanted her to "know what happened," but Bond replied that she did not want to know because what she did not know she could not repeat. Appellant asked whether Deanda had been found, and Bond said "yes." Appellant then asked whether she was dead, and Bond again said "yes."

According to Bond, appellant then related to her the events of the previous Friday night. He told Bond he had gone to Deanda's apartment and had broken the glass, unlocked the window and crawled into the apartment. Deanda came home and discovered appellant in her apartment and threatened to "turn him in." They talked for awhile and appellant persuaded Deanda not to. Appellant then asked Deanda to take him home "because he was still messed up." She agreed, looked for her shoes, but could not find them and decided to wear her booties. The temperature that night was about 65 degrees. They left in her Chevrolet and went to Babba Boy's.

As Bond recalled in a police statement given Friday, February 28, 1986, after appellant confessed to her:

"[Appellant] said that he got out of the car at Babba Boy's. [Appellant] said that he walked on the side that the dumpster was on and he took a leak. [Appellant] said that a guy came around the building, at him with a knife. [Appellant] said at that time he took the guy out with his knife. [Appellant] said that him and the guy fought and that he stabbed the guy about three times. [Appellant] said that he knew for sure that he had stabbed him in the gut at least once. [Appellant] did not say where the girl was at this time. [Appellant] said that he went and got back into the car and they left Babba Boy's."

Appellant told Bond that on the way back to Bond's apartment, Deanda asked him "if he wanted to be with her, and he said yes. [Appellant] said that is when they went to the house, where the car was found ...

[and] they ... parked in the driveway."
While they were having sexual intercourse,
Deanda suddenly "went off," meaning "she
started screaming." Appellant then put
his hand over her mouth to quiet her, but
Deanda began hitting and scratching him.
Appellant himself then "went off and he
started to hit her back," but he did not
recall how many times he hit Deanda. De-
anda then "went out" and, appellant told
Bond, this scared him.

According to Bond's testimony, appellant
then leaned over her to see if Deanda was
breathing and barely felt a pulse. He then
grabbed her by her legs and pulled her out
of the car, but "when he did that her head
hit the concrete. [Appellant] said it sound-
ed like somebody had threw a brick on
concrete and it bursted [sic]. [Appellant]
said that then he grabbed her by one leg
and pulled her into the woods." By this
time it was about 4:00 a.m. Saturday morn-
ing, and appellant returned to Bond's
apartment.

According to Bond's statement given to
police Friday, February 28, 1986:

"I told [appellant] that I had been down
to the Police station and that I had given
a statement. [Appellant] asked me if I
lied. I told him, that I told them every-
thing that happened that night. [Appel-
lant] told me that was good and that he
was sorry he had got me into all this
mess. I told [appellant] he needed to

turn himself in. [Appellant] told me he
couldn't. I told [appellant] that after he
left I was going to have to call the police.
[Appellant] said that he understood and
he asked if I would just do him one favor
and that was just to wait at least an hour
or two before I call the police. I told him
no, that I could not do that."

When appellant left, Bond called the police.
Later that night she was informed by De-
tective Gendrett that appellant had been
apprehended.

### Appellant's Midnight Confession
### to Detective Hill

Detective J.R. Hill testified that just be-
fore midnight on Tuesday night, he "re-
ceived information that [appellant] could
possibly be in a vacant house that was just
across the fence where Cheryl Bond's
apartment was." Hill and two deputies
found appellant there and arrested him. In
the cage in the back of one of the squad
cars appellant made a statement to Hill
that largely comported with the story he
had told Bond earlier that evening. Ac-
cording to Hill, however, appellant told him
Deanda was killed when he "slung" her to
the ground; that he had "just smashed her
face against the concrete." Appellant's
statement to Hill was not reduced to writ-
ing, but we recapitulate Hill's trial testimo-
ny in the margin.[1]

1. "He told me that killing Ruth [Deanda] had kind of been an accident, and I don't recall if he said that he didn't mean to kill her or he didn't intend to kill her, but either one of the two.... [H]e said he had gone to Ruth's apartment on that Friday night or early Saturday morning and that he had intended to break into the apartment.... He said Chachi [Medina] had been with him earlier and that they had dis- cussed breaking into the apartment but Chachi had backed out on it because he knew Ruth too well.... He said after he had taken Chachi home he had gone over to Ruth's apartment and had broken in.... He said that he got into the apartment ... and he had taken a TV that was sitting either on a stand or a table ... and unplugged it and unhooked the cable from it and wrapped up the cord.... He said that after he had that ready to go he went to the kitchen and started taking some things from the refrig- erator and cabinets [to Cheryl Bond's car].... After he put the things in the car he went back into the ... apartment and was preparing to take the TV when he said he heard footsteps

outside and rattling of keys.... He said he went and hid in the bathroom behind the door.... He said that he had seen the TV sitting on the floor and figured when Ruth seen it she would see it and realize she was being burglarized and would probably go to another apartment to call the police and at that time he could get out.... He said that as he was—she came into the apartment, and instead of her leaving like he thought she would she started looking around in the apartment like she was seeing what was missing or whatever.... He said that as she was walking around in the apartment that she came up to the door of the bathroom and looked in and apparently saw him behind the door.... So at that time he went ahead and pushed the door open and stepped out and told her not to scream.... He said she didn't scream and that apparently she recognized who he was, and she started asking him why he was trying to rip her off.... He said that she told him that she didn't have a whole lot to begin with but whatever she had

*Medical Examiner's Testimony*

The Assistant Medical Examiner, Dr. Jordon, performed an autopsy on Deanda. He described Deanda as being five feet tall and weighing 100 pounds. She had a black eye consistent with a skull fracture, a bruised lip and scratches on her legs and face. She also had an alcohol content of approximately .10.

she would be willing to give him if he had asked her for it.... At that point he broke down and started crying, and I let him sit there and cry for several seconds ... and when he finished crying he said that's the kind of person she was.... He said when he first asked her not to scream and they started talking they went over and sat down on the bed.... He said that he could tell she was still scared, and he wanted her to relax. So he had the knife in the sheath on his belt, and he wanted her to know he wasn't going to hurt her. So he told her if it would make her feel better and he pulled out the knife and gave her the knife.... He said she laid it on the bed.... [S]he had been telling him that if he had wanted the stuff she'd have gave it to him and all that and that they had talked for about 30 minutes is what he told me sitting on the bed.... He said that Ruth had been talking to him about drugs and that she had told him that was the reason she had moved out from Marylou Lopez's apartment was because she wanted better things for her kids.... He said ... after they had this conversation for a while she asked him to put her TV back up on the stand.... He said that he put the TV back up on the stand and hooked up the cable to it but said that he didn't plug it back in.... He said that because he was messed up that night, indicating he was drunk, that Ruth had started trying to talk him into letting her drive him home. [He indicated that] she wanted to take him home in his girlfriend's [Bond's] car.... I think he had mentioned that apparently she had seen Cheryl's [Bond's] car.... He said that he agreed to let her take him home but then he remembered the things he had taken out of the kitchen and had put into Cheryl's car and he didn't want her to see that because he said he was ashamed.... He said he talked her into taking him home in her car.... He said that they went out and got into the car and that they had left, went down Imperial Valley to 525 and turned going east on 525 towards 59.... Ruth was [driving the car] according to him.... He said he had been staying with Cheryl and she was taking him home.... He said as they were driving down 525 that Ruth asked him, Lee, do you want to be with me? ... He said he told her, yes, but he didn't think she really wanted to be with him.... He said that she said you never know till you ask.... He said that he asked her if she wanted to.... He said that he directed her to drive to the house on Delmack.... He said that after they got ... [t]o the house on Delmack that they started getting it on.... He said they were in the front seat of the car ... [H]e told that he had pulled her shorts down and her panties down and had taken them off of one leg and that they were just hanging on her an-kle.... He said he had pulled them off of one leg, and they were just on her ankle on the other leg.... [H]e said ... he pushed her blouse up and pushed her bra up above her breasts.... [H]e said she wasn't wearing any shoes, that she was just wearing white booties.... He said that she didn't leave the apartment with any shoes, that all she had on was ... little white booties.... He said they were getting it on in the front seat of the car and he wanted to get in the back seat and was trying to talk her into getting into the back seat but she didn't want to. She said the front seat was fine.... He said that he was about to get it off in her and that she ... just suddenly freaked out and started scratching him.... He said that whenever she started scratching him he started trying to get out of the car and that after he got out—or he just said I went crazy, and that after he got out of the car he grabbed her.... He said while she was scratching him he said he just went crazy, and he was trying to get out of the car, and whenever he finally got out of the car he just reached in and grabbed her and punched her in the face.... He said that after he punched her in the face she just laid face down in the seat and that he reached in with his right hand and grabbed her by the hair and then got her by the arm with his other hand and started dragging her out of the car.... He said that she was laying face down in the seat and he was standing outside the car, and he reached in and grabbed her hair with his right hand and got ahold of her arm with his other hand and started dragging her out of the car.... He said he was dragging her out of the car, and he said her feet were still on the seat. He just raised her up and slung her down.... He said he just smashed her face against the concrete.... He said she never made a noise.... he said she must have died real fast because she never made a sound.... He said he drug her body into the woods ... He said he had blood on his pants and his shoes and that Cheryl asked him about it and he had told her he had got into a fight with a guy at ... Babba Boy's grocery on Lee Road and that he had stabbed him.... I think he said that he went ahead and just told her that story because he had the blood on him.... He said that he went back outside to get rid of Ruth's car and that when he got into the car it wouldn't start.... [H]e asked [one of Bond's neighbors] if he could give him a jump.... He said I steered the car back to the house on Delmack where I killed Ruth.... He said he really must have wanted to get caught because he said after he killed Ruth he hitchhiked to Kansas and turned around and hitchhiked back."

It was Jordan's opinion that Deanda died as a result of a fractured skull "with resultant subarachnoid hemorrhage due to blunt trauma to the head." By blunt trauma, Jordan explained, he meant "that either an object struck the head or the head struck an object or a surface," but "the more probable cause was the use of considerable force making the head strike the pavement or whatever surface." The force required to inflict the blow, Jordan testified, could have been the force of gravity alone from a height at least two feet from the ground.[2] Jordan found a one-inch laceration on the left side of her forehead, which was surrounded by an area of abrasion and bruising. He testified that "the most likely possibility" was that the laceration, abrasion and bruising were inflicted at the same time, consistent with a "one-blow theory." Jordan concluded that the lack of hemorrhaging in the brain indicated that Deanda died very quickly after the fracture of "the most delicate part" of her skull. While the fluids in the body were consistent with her having been left face down, the twigs and brush in the back of her hair was consistent with her having been dragged face up. Jordan found no marks on her body, or her eyes, which would indicate that she had been struck with a human fist. He testified that it was also possible that Deanda had died from suffocation, although the condition of her body indicated otherwise.

Jordan estimated appellant weighed approximately 145 or 150 pounds and was "five ten, five nine." When asked by the prosecutor whether the injury to Deanda was consistent with a person his height and weight "smashing her face against concrete," Jordan ultimately responded that it was. On cross-examination he admitted it was "possible" that Deanda's injury could have been caused by the force of gravity alone, if she was pulled feet first from the car and her head struck the ground. But "the more probable cause" of Deanda's injury, Jordan maintained on redirect, was not the mere force of gravity, but "the use of considerable force making the head strike the pavement or whatever surface."

Jordan found no acid phosphatase (an enzyme present in high concentration in semen), and no lacerations, "no abrasions, no areas of hemorrhage, or indication of any trauma to [the vaginal] area." He did, however, find sperm deposited in Deanda's vagina, but no tests were conducted to determine whether it matched appellant's. Jordan indicated that it could have been there up to five to seven days before her death.

## B.

In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the United States Supreme Court identified the test for determining the due process threshold for sufficiency of the evidence to be "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573. In *Butler v. State*, 769 S.W.2d 234 (Tex.Cr. App.1989), this Court reaffirmed the "outstanding reasonable alternative hypothesis" analysis as a "utilitarian" approach to measuring sufficiency of circumstantial evidence to ensure it meets minimum due process requirements that guarantee convictions will not be had on less than proof beyond a reasonable doubt. *Carlsen v. State*, 654 S.W.2d 444 (Tex.Cr.App.1983) (Opinion on State's motion for rehearing).[3] The State relies upon circumstantial evi-

2. The prosecutor gave Jordan a photograph of the car in which appellant and Deanda apparently engaged in sex and asked, "Can you tell the members of the jury based upon just looking at the pictures of that car and given your basic knowledge as an American consumer about cars about ... how high it appears from the ground to the seat?" Jordan replied, "Looks to be approximately two, two and a half feet from the seat to the ground."

3. In *Geesa v. State,* this Court decided that the "reasonable-hypothesis-of-innocence analytical construct" was not valid "in light of this Court's earlier decision to abrogate the circumstantial evidence charge." *Geesa v. State,* 820 S.W.2d 154, at 155 (Tex.Crim.App.1991). This Court also noted in *Geesa,* however, that this decision applied only to cases tried after *Geesa. Geesa v. State,* 820 S.W.2d, at 163.

dence to prove the underlying offenses of robbery and kidnapping, and that appellant killed Deanda "in the course of" the admitted burglary of her apartment. Appellant now contends that his statements to Bond and Detective Hill raise reasonable alternative hypotheses negating any inference that he robbed or kidnapped Deanda, or killed her "in the course of" committing the burglary.

■ According to appellant's statements, after discovering him in her apartment, Deanda offered to drive appellant home and consented to sexual relations with him along the way. Thus, far from being abducted, Deanda accompanied appellant willingly. Furthermore, it may be inferred from appellant's statements that the killing was not perpetrated to facilitate either the burglary, which was already complete, or the taking of Deanda's car, which was essentially an afterthought. Although presenting appellant's statements in their entirety in its case in chief, the State is no longer bound to the exculpatory portions therein. See *Russeau v. State*, 785 S.W.2d 387 (Tex.Cr.App.1990). Having no burden to disprove exculpatory portions of appellant's statements, however, the State nevertheless must prove beyond a reasonable doubt that he killed Deanda in the course of actual or attempted burglary, kidnapping or robbery. In applying the "reasonable alternative hypothesis" analysis, "[t]he correct procedure involves accepting the inculpatory circumstances ... and then asking if there is a reasonable hypothesis other than guilt which also would account for such circumstances." *Girard v. State*, 631 S.W.2d 162, at 164 (Tex.Cr.App.1982). Thus, if exculpatory aspects of appellant's statements are fully consistent and in harmony with all of what would otherwise appear to be purely inculpatory circumstan-

tial evidence presented by the State, then under *Carlsen* and *Butler*, both supra, we would be constrained to hold the evidence insufficient. If, on the other hand, exculpatory aspects of appellant's version of events necessarily contradict or conflict with inculpatory inferences drawn from other circumstantial evidence presented by the State, and all of the evidence viewed in the light most favorable to the prosecution would rationally support a jury verdict of guilt to a degree of confidence beyond a reasonable doubt, we must hold the evidence sufficient. In our view this case falls into the latter category.

■ To be sufficient, the evidence need only support one of the theories of capital murder submitted to the jury. *Pinkerton v. State*, 660 S.W.2d 58, at 62 (Tex.Cr.App. 1983). Canvassing the evidence, apart from exculpatory aspects of appellant's statements, we find it shows without dispute that appellant entered Deanda's apartment without her consent. Appellant's own statements establish that Deanda discovered him there and that he had a knife. Thereafter they drove in Deanda's car to the abandoned house on Delmack Street, where appellant had sex with Deanda and then killed her. Deanda's body was found in the nearby woods, without shoes.[4] Although she was apparently acquainted with appellant beforehand, it may be inferred from her responses to his phone calls at her workplace that she had resolved to have no further contact with him by the time she discovered him in her apartment.[5] Appellant's story that Deanda was friendly toward him after she discovered he had broken into her apartment, and that she volunteered to drive him home, does not "account for" this apparent aversion. *Girard v. State*, supra. Because Deanda could identify him to the police, appellant

---

4. In his statement appellant explains that Deanda had not been able to find her shoes. In view of the fact she had just gotten home from work and at least one nightclub, the jury could reasonably presume she was wearing shoes when she discovered appellant in her apartment. Even if one accepts appellant's story that they sat on Deanda's bed awhile and talked, the jury could reject the contention that in that short amount of time Deanda would misplace her

shoes; that she had no other pair to wear; and that she would willingly leave in the middle of the night with temperatures in the sixties wearing only shorts and a pair of booties on her feet.

5. There was evidence to support a conclusion that the unidentified "male" Deanda expected to meet later was not appellant, but her boyfriend, "Steve."

would have had a motive to silence her. From these facts a jury could reasonably infer that Deanda did not willingly accompany appellant, and that some force was likely used to overcome her will. Accordingly, it could be found that appellant "restrained" Deanda, within the contemplation of V.T.C.A. Penal Code, § 20.01(1)(A).[6] Furthermore, that he took Deanda to the abandoned house would support an inference that this restraint would soon rise to the level of an "abduction," for purposes of § 20.01(2)(A).[7] Thus a jury could reasonably conclude appellant was at least attempting to kidnap Deanda, as that offense is defined by V.T.C.A. Penal Code, § 20.03(a),[8] at the time he killed her.

Because the exculpatory portions of appellant's statements are not consistent with all of the circumstances that would otherwise tend to establish appellant killed Deanda in the course of attempting to kidnap her, they do not present a reasonable alternative hypothesis necessarily demonstrating that a finding of guilt beyond a reasonable doubt is not a rational finding. Viewing all of the evidence in the light most favorable to the prosecution, while we cannot say the inference that appellant was attempting to kidnap Deanda when he killed her is a particularly compelling one, neither can we conclude that no rational jury could have accepted that inference to a degree of confidence beyond a reasonable doubt. *Jackson v. Virginia,* supra. We hold the evidence is sufficient to sustain the jury's verdict and overrule appellant's first point of error.

## II.

■ In points of error two and three, appellant asserts that the dismissal of veni-reperson Mrs. Ralph E. Frede was improper because she was qualified to serve as a juror under standards announced in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) and *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Specifically, appellant argues that she was qualified even though she disagreed with the death penalty since she stated she could conscientiously and impartially apply the law and obey the oath of a juror.[9] Appellant therefore asserts that the trial court's decision to grant the State's challenge for cause against Mrs. Frede violated his right to an impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

We excerpt portions of Frede's voir dire examination to illustrate appellant's contention, beginning with questions propounded by the prosecuting attorney.

Q. ... Now, knowing that a lot of people tell us that they could not serve as a juror to that degree on a capital murder case. So my question to you is: Do you feel that your—your reservations about the death penalty are such that they would prevent you from serving on a capital murder jury and ever answering "yes" to those two punishment questions regardless of what the State presented as evidence? Does that make sense?

A. If you stopped with the first part of the question.

Q. Okay. I get no respect from my co-counsel.

Would your reservations about the death penalty prevent you from ever answering

---

**6.** § 20.01(1)(A), supra, reads:

"(1) 'Restrain' means *to restrict a person's movements without consent,* so as to interfere substantially with his liberty, *by moving him from one place to another* or by confining him. Restraint is 'without consent' if it is accomplished by:

(A) *force,* intimidation, or deception[.]"

(All emphasis supplied unless otherwise indicated.)

**7.** § 20.01(2)(A), supra, reads:

"(2) 'Abduct' means to restrain a person with the intent to prevent his liberation by:

(A) *secreting or holding him in a place where he is not likely to be found* [.]"

**8.** § 20.03(a), supra, reads:

"(a) A person commits an offense if he intentionally or knowingly abducts another person."

**9.** The oath referred to at this point and hereafter is that of Art. 35.22, V.A.C.C.P.: "You and each of you do solemnly swear that in the case of the State of Texas against the defendant, you will a true verdict render according to the law and the evidence, so help you God."

those two punishment questions in the affirmative?

A. I don't know ...

From her initial answers to the voir dire questions, Ms. Frede's position on capital punishment appeared uncertain. Upon further questioning, however, she voiced her opposition to the death penalty. During the following questions, she indicates that she could never answer "yes" to the special issues [10]:

Q. (By Mr. Graham) ... I think my question is: Can you imagine yourself ever in any kind of a capital murder case voting "yes" to those two punishment questions if you find somebody guilty of capital murder?

A. I think feeling the way I do that probably it would be better for me not to be on a jury where I would have to consider those questions.

Q. See, I understand your feelings and that's a very natural feeling to have. Unfortunately in the law we have to have definite answers—

A. Oh.

Q. —one way or the other at this stage which may seem unfair because you haven't heard any evidence or anything else and you're having to project into the future about what you would do; but the law requires us to ask you to be definite about whether or not you could do that because we can't at this stage have you say "maybe" or "maybe not," and then put you on the jury and then a month from now you finally realize, "Hey, I can't do it." So we have to press you to get you to say "yes" or "no" to whether or not you could ever say "yes" to those questions.

A. Well, I think since there is a doubt in my mind it would be better for me to say no.

Q. Okay. Does that mean that no matter what kind of evidence the State might present in a case, capital murder case, you could never say "yes" to those questions because you know if you said "yes" the death penalty would result?

A. I think you are asking me the same questions that I've already answered.

Q. You haven't answered it. I'm not trying to quarrel. I'm under a duty to keep asking you the questions unless you say "yes" or "no." I don't want to offend you by asking too many times, but my counsel wants me to explain. I am not deaf. I did hear your answers earlier, but—and I did; but we do have to have definite answers, either, "Yes, I could answer those questions 'yes' if the State proved the case to me knowing the death penalty would result," or, "No, I couldn't because I feel like I do about the death penalty and the reservation I have about it I could never vote 'Yes' to those questions." I mean that's where we're stuck I realize, but we have to get a "yes" or "no."

A. Okay. In that case, no ...

After several other questions by the State, the venireperson was then examined by counsel for Appellant. Next, the court addressed the witness concerning her views on the death penalty. Finally, she was questioned again by the State. Ms. Frede's opposition to the death penalty appeared to be further reinforced when she was asked by the State whether she could follow the oath of a juror. She responded that answering "yes" to the special issues would mean violating her conscience and she therefore could not take the oath. Specifically, she responded to the prosecutor's questions in the following manner:

Q. ... From what you told me earlier and from what you told Mr. Scardino I got the feeling that you were saying that

---

10. When appellant was found guilty, the jury was required to answer the following special issues during the sentencing phase:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."

Art. 37.071(b).

your feelings about the death penalty would prevent you from ever taking an oath that would say, well, I affirm or swear that in this capital murder case I will a true verdict render according to the law and the evidence so help me God. Basically you are saying that you would swear to follow the law as a juror; that if you took that oath then you'd be placed on a jury and you would have to follow these laws; but that I understood you to say that your feelings were such that you could never conscientiously take that oath because you know if you did then you'll be placed in the situation of having to follow the laws that disagree with your conscience and feelings; is that correct?

A. I thought that was the choices (sic) I was being given, yes.

Q. I think that's the choice the law—

A. That was my understanding of what you said.

Q. That's the way I understand it is; that if you feel conscientiously that you could not, should not be placed in the position of having to violate your conscience then you don't have to take the oath to follow the laws that you disagree with to that extent. So is it my understanding that if you were asked to serve on a jury that would require you to answer "yes" to those punishment questions, if you got that far that the law required you to say "yes" if the State proved its case; that you could never take that oath? I just read you to be that particular type of a juror because answering "yes" to those questions would violate your conscience to the point that you would not conscientiously take that oath to be a juror; is that correct?

A. That's correct.

Q. Okay.

MR. GRAHAM: We challenge on that basis, Your Honor ...

At this point, the trial judge did not grant the State's challenge for cause. Instead, the prosecutor was allowed to probe further into Ms. Frede's beliefs. This revealed somewhat contradictory answers.

She stated that she could follow the oath and answer the special issues "yes"; however, in response to prior questions, she stated that she could *not* answer the special issues "yes" if it meant that the death penalty would result. Specifically, the following interchange occurred:

Q. ... Okay. If you were forced to take an oath to be on the jury and put on a jury like a capital murder case and you heard evidence that convinced you beyond a reasonable doubt that the defendant was guilty and that the answers to those two punishment questions should be "yes," would you nonetheless have to answer one of those questions "no" to make sure the defendant didn't get the death penalty?

A. No.

Q. Okay. Then you are assuring me that if you were put on a jury like that and the State proved to you that the answers should be "yes" to those punishment questions that you would say "yes"? You would actually say "yes" if you were put on this jury and if it were proven beyond a reasonable doubt?

A. Yes.

Q. You realize what you are saying now?

A. Yes ...

Towards the end of her voir dire, Ms. Frede once again contradicted her initial answers. The following questions were asked and answered:

Q. (By Mr. Graham) ... I guess I'm concerned that you feel obligated somehow, you know, to follow the law and it may be at this particular moment overriding, you know, what you might really feel when you get home tonight and you realize I sat up there and they bombarded me with a bunch of questions. Then when I thought it was all straight, the Judge talked to me, then questioned me some more because I was confused about it. When I get home laying down getting ready to go to sleep the bottom line is I'm going to have to vote for the death penalty if the State proves their case, why didn't I tell them, why didn't I do

that? Why didn't I just tell them when I had a chance. It's too late.

A. I think I told you.

Q. Okay.

A. I'm not in favor of the death penalty. When asked if I had to be on the jury, if I could answer "yes" to those questions the answer is yes.

Q. Then you really feel you could say "yes" to the questions?

MR. ROBERT SCARDINO: Objection, the inquiry requires the same thing.

THE COURT: Overruled.

Q. (By Mr. Graham) If you really could say "yes" to these questions then if the State proved to you that they should be answered yes.

A. Yes.

Q. You really would do that?

A. Yes ...

At this point, a discussion was held among the court, the prosecutor, and appellant's attorney wherein each communicated their respective opinion on the law regarding granting a challenge for cause based on a juror's views on the death penalty. After a lunch recess, Ms. Frede was asked a few more questions by the court during which it was somewhat incorrectly communicated to her that she had a choice whether to take the juror's oath. When she communicated her desire to not take the oath, the State renewed its challenge for cause which the trial court then granted.

The state may properly challenge a venireman if he refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge. *Wainwright v. Witt*, 469 U.S., at 422, 105 S.Ct., at 851, 83 L.Ed.2d, at 850. If the juror is to obey his oath and follow the law, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. *Ellis v. State*, 726 S.W.2d 39 (Tex.Cr. App.1986); *Adams v. Texas*, 448 U.S., at 46, 100 S.Ct., at 2523, 65 L.Ed.2d, at 590. Refusing to take the juror's oath demonstrates that a person's views prevent them from carrying out the duties of a juror. See *Ellis v. State*, 726 S.W.2d, at 44.

In ruling on a challenge for cause, the trial judge must determine whether the prospective juror's views on the death penalty would prevent or substantially impair the performance of their duties as a juror in accordance with the instructions given by the court and the oath taken by the juror. *Farris v. State*, 819 S.W.2d 490 (Tex.Cr.App.1990); *De-Blanc v. State*, 799 S.W.2d 701, at 717 (Tex.Cr.App.1990); *Wainwright v. Witt*, 469 U.S., at 420, 105 S.Ct., at 850, 83 L.Ed. 2d, at 849; *Adams v. Texas*, 448 U.S., at 45, 100 S.Ct., at 2526, 65 L.Ed.2d, at 589. When presented with a prospective juror who has conflicting feelings regarding the law, the juror's oath, and capital punishment, the trial judge is in a unique position to determine whether those same feelings would prevent or substantially impair the venireperson's performance as a juror. *Farris v. State*, 819 S.W.2d, at 501. It is not a requirement that a prospective juror's bias be proven with unmistakable clarity. *Id.; DeBlanc v. State*, 799 S.W.2d at 717. This court accords the trial judge's ruling great deference in this regard given that the trial judge's determination that a prospective juror would be prevented or substantially impaired from obeying his oath and following his instructions is based largely upon determinations of the venireperson's credibility and demeanor. *Farris v. State*, 819 S.W.2d at 501; *Fearance v. State*, 771 S.W.2d 486, at 501–02 (Tex.Cr. App.1988). In determining whether a trial judge abused his discretion in granting the State's challenge for cause to the prospective juror, the juror's testimony as a whole must be examined. *Farris v. State*, 819 S.W.2d, at 501; *Fearance v. State*, 771 S.W.2d, at 500.

The facts in *Farris* were almost identical to those in the instant case. In *Farris*, a prospective juror was questioned during voir dire concerning her views on the death penalty. *Farris v. State*, 819 S.W.2d at 499. Initially, she stated that she could not, under any circumstances, render a verdict which assessed the death penalty. *Id.* Upon further questioning, however, the

venireperson "vacillated." *Id.* at 500. She stated that she would follow the oath of a juror and vote "yes" on the special issues "in the proper case and the proper evidence" although to do so would have "violated her conscience." *Id.* Throughout the remainder of the voir dire, she repeated that she was opposed to the death penalty but understood the oath and would not violate it. *Id.* Confronted with these facts, we held that "[w]hen presented with a prospective juror who has conflicting feelings regarding the law, the juror's oath, and capital punishment, the trial judge is in a unique position to determine whether those same feelings would prevent or substantially impair the venireperson's performance as a juror." *Id.*, at 501. Since we believed that the trial judge was in the best position to determine if her feelings of opposition towards capital punishment would effect the performance of her duties as a juror, we deferred to his ruling. *Id.*, at 501, fn. 3.

We find in this case that the trial court did not err when it granted the State's challenge for cause against Mrs. Frede. She had strong feelings about the death penalty which were reflected in her voir dire answers. She initially stated that she could not answer the special issues "yes" if it meant imposition of the death penalty. She then stated that she could follow the oath and answer the special issues "yes", although it would "violate her conscience." This was not wholly inconsistent with her previous answers since her opposition to capital punishment was still evident. Additionally, her comment that following the oath might violate her conscience seemed to be forgotten as the voir dire progressed. Her views may therefore have prevented her from performing her duties as a juror. Additionally, these feelings may have prevented her from answering the statutory questions without conscious distortion or bias. The juror's entire voir dire testimony

evidences that her beliefs regarding the death penalty went beyond merely influencing her in her deliberations at the guilt and punishment phases of the trial. The trial judge was in the best position to determine whether they would prevent or substantially impair the performance of her duties. We will therefore defer to his ruling. Accordingly, points of error two and three are overruled.

### III.

Appellant argues in his fourth point of error that the trial court erred in striking venireperson Mrs. Ralph Frede because appellant's counsel was not allowed to cross-examine her before the State's challenge for cause was sustained. As support for this proposition, appellant cites this court's holding in *Perillo v. State*, 656 S.W.2d 78 (Tex.Cr.App.1983).

In *Perillo*, the defendant was never allowed to question a prospective juror. *Perillo*, supra at 79. After this juror had been examined by the State during voir dire, it could not be determined whether he held views that prevented him from making an impartial decision on the imposition of the death penalty. *Id.*, at 81. The Court then granted the State's challenge for cause against the venireperson. *Id.* Defense counsel, however, was never given an opportunity to question this person. *Id.* Because Article 35.17 § 2, V.A.C.C.P.[11] expressly allows the defendant to examine prospective jurors in capital felony cases, we found that it was error to refuse defense counsel the opportunity to question the venireperson before granting the State's challenge for cause. *Id.*

Unlike the defendant in Perillo, appellant in the instant case was given the opportunity to examine venireperson Frede. She was initially questioned by the State and then passed to appellant's counsel. Next,

---

**11.** Article 35.17, § 2 provided at the time:

In a capital felony case, the court shall propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion. Then, on demand of the State or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court.

she was questioned by the Court. The State was then allowed to propound additional questions to venireperson Frede. Finally, the State's challenge for cause was granted with appellant noting his objection. Although appellant may have preferred to re-examine the prospective juror immediately before the court's ruling on the challenge for cause, we cannot say that appellant was not given an opportunity to question Ms. Frede. We hold, therefore, that the trial court complied with Article 35.17 § 2. As a result, this point is overruled.

## IV.

▆ In points of error five and six appellant complains of the exclusion of venireperson Janet Spradling. Specifically, appellant asserts that this venireperson's beliefs did not disqualify her from serving as a juror in a capital case and that granting the State's challenge for cause violated his right to an impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. However, appellant did not object when the court granted the State's challenge for cause. A timely objection is required to preserve a complaint for appellate review. Tex. R.App.Proc. 52(a). Points of error five and six are consequently overruled.

## V.

▆ In point of error number seven, appellant asserts that Article 37.071, V.A.C.C.P.[12] is unconstitutional as it was applied to him. Specifically, appellant argues that the instruction given to the jury in the penalty phase of the trial pursuant to this Article deprived the jury of any procedure for considering and giving weight to mitigating evidence concerning his childhood and background in order that they might return a sentence less than death. The record does not reflect that appellant requested an instruction which he believed more adequately directed the jury to consider his mitigating evidence.

Pursuant to *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) and *Black v. State*, 816 S.W.2d 350, at 364–

365 (Tex.Cr.App.1991), we will consider appellant's claims that the Texas death penalty scheme was unconstitutional as applied to him. In the instant case, appellant believed his turbulent family background and relative youth would have a mitigating effect on the jury's punishment deliberations. We must determine whether, in the absence of instructions informing them they could consider and give effect to appellant's mitigating evidence, the jury was provided with a vehicle for expressing a "reasoned moral response" to that evidence in reaching its verdict. *Gosch v. State*, 829 S.W.2d 775, at 785 (Tex.Cr.App.1991); *Penry v. Lynaugh*, 492 U.S., at 328, 109 S.Ct., at 2951, 106 L.Ed.2d, at 284.

Expert testimony during the punishment phase of *Penry* established that the defendant was mildly to moderately retarded. *Penry v. Lynaugh*, supra. Although he was twenty-one years old when he committed the charged crime, the defendant had the learning ability of a six-and-a-half year old and the social maturity of a nine or ten year old. It was further established that Penry suffered from "an organic brain disorder at the time of the offense which made it impossible for him to appreciate the wrongfulness of his conduct or conform his conduct to the law." Penry was severely punished and routinely beaten as a child. Additionally, Penry was in and out of state hospitals and schools throughout his childhood. The state's experts testified that "Penry was a person of extremely limited mental ability, and that he seemed unable to learn from his mistakes." This evidence was found to be a "two-edged sword": it not only could have reduced culpability for the crime, but also pointed toward a finding of future dangerousness. The Supreme Court found that Penry's brain damage, mental retardation, and background was unique evidence which was relevant to his moral culpability. Furthermore, the Supreme Court held that, because of the unique nature of this evidence, the special punishment issues submitted to the jury at Penry's trial did not

12. See Footnote 9. ▆

provide the jury with a vehicle for expressing its "reasoned moral response to that evidence in rendering its decision."

Appellant pointed this Court to evidence presented at trial which showed that he was abused as a child. Appellant established that his natural mother abandoned him at age three-and-a-half. His adoptive parents were also strict disciplinarians and sent him to school unbathed and unfed as a form of punishment. A school record that was admitted into evidence documented a teacher's suspicion that they were sexually abusing him. One school authority testified appellant manifested "deep emotional problems." Appellant developed behavioral problems and there is some evidence he suffered from a hearing impairment and a learning disorder. He spent time in and out of juvenile and foster facilities and was expelled from his adoptive home at the age of seventeen. He was twenty years old when he committed the instant crime.

 Evidence about a defendant's background and character is relevant because defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse. *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934; *Goss v. State*, 826 S.W.2d 162, at 165–166. However, a jury instruction on this type of mitigating evidence may not be required unless the mitigating evidence is relevant to the special verdict questions, or has relevance to the defendant's moral culpability beyond the scope of the verdict questions. *Lackey v. State*, 819 S.W.2d 111, at 135 (Tex.Cr.App.1989).

 "In *Lackey*, we suggested that mitigating evidence may be relevant to the jury's individualized assessment of the propriety of death if there is a nexus between the mitigating evidence and the circumstances surrounding the crime that might, from the viewpoint of the society, reduce the defendant's 'deathworthiness.' " *Goss v. State*, 826 S.W.2d at 165. In other words, the evidence must tend to excuse or explain the criminal act, so as to make that particular defendant not deserving of

death. *Nobles v. State*, 843 S.W.2d 503 (Tex.Cr.App.1992); *Goss v. State*, 826 S.W.2d at 165; *Lackey v. State*, 819 S.W.2d at 135, fn. 10.

In *Goss v. State*, the defendant, like appellant in the instant case, presented evidence of a troubled childhood. *Goss v. State*, 826 S.W.2d, at 166. This included being beaten as a youngster with a shoe, a belt, and a wooden slat. *Id.* However, there was no testimony as to any mental disorder or physiological damage actually suffered by the defendant that explained why he was less morally "culpable than defendants who had no such excuse." *Id.* We held that the evidence was not relevant, beyond the scope of the special issues, to the jury's individualized assessment of the defendant's moral culpability for the crime. *Id.* None of the evidence presented by the defendant sought to explain the connection between the problems of his childhood and the commission of the crime. *Id.* We held that evidence of troubled childhood was adequately encompassed within the jury's consideration of special issue two—whether the murder was an aberration or an indication of the defendant's propensity to commit future acts of violence. *Id.*, at 167.

As in *Goss*, appellant presented no evidence which sought to explain the connection between appellant's troubled childhood and the commission of the crime. Appellant's background evidence does not tend to excuse or explain his criminal act, such as the evidence of organic brain damage and mental retardation that was presented by the defendant *Penry*, supra. "Sympathetic as we may be to his plight during childhood and adolescence, we do not think appellant might rationally be found less morally culpable for his adult behavior on this basis, according to contemporary moral values as shared by a significant segment of our society." *Draughon v. State*, 831 S.W.2d 331 (Tex.Cr.App.1992). Whatever relevance this evidence may have to the special issues, it was adequately encompassed with the jury's consideration of special issue two. *Fuller v. State*, 827 S.W.2d 919, at 936 (Tex.Cr.App.1992); *Goss v. State*, 826 S.W.2d 162, at 166 (Tex.Cr.App.

1992); *Earhart v. State*, 823 S.W.2d 607, at 632 (Tex.Cr.App.1991); *Lackey v. State*, 819 S.W.2d at 134.

We also find that appellant's childhood sexual abuse evidence was within the scope of special issue number two. The evidence was limited to a school record that documents a grade school teacher's suspicion. These allegations were never proven nor were they supported by oral testimony during trial. Nevertheless, even if such abuse existed, there was no connection or "nexus" between it and the charged offense. Appellant was not found guilty of a sexual crime. The jury charge did not direct a capital murder conviction if the jury found a murder was committed during the course of committing or attempting to commit an aggravated sexual assault. Appellant's own oral statement reflected that the sex between he and his victim was consensual. Appellant also testified during the punishment phase that it was consensual. Since the crime committed by appellant was not charged as a sexual offense, we find no nexus between it and his childhood sexual abuse. We therefore find that the special issues adequately provided the jury with a vehicle for expressing a reasoned moral response to that evidence in reaching its verdict. *Gosch v. State*, 829 S.W.2d at 785–86.

Appellant also argues in his seventh point of error that Article 37.071 is unconstitutional as applied to him because the jury was precluded from giving any mitigating effect to his relative youth. In *Lackey*, we held that age is a factor that can be considered within the ambit of the second special issue. *Lackey v. State*, 819 S.W.2d at 134. All aspects of appellant's seventh point of error are therefore overruled.

## VI.

In his eighth point of error, appellant argues that the trial court erred in overruling his motion to suppress appellant's oral statement to Detective J.R. Hill and also permitting Detective Hill to testify about the statement. The trial court ruled that the statement was admissible under Article 38.22, § 3(c), V.A.C.C.P., and allowed testimony regarding the statement. Appellant asserts that for an oral statement to be admissible under Article 38.22, § 3(c), the facts in the statement must be unknown to the police at the time the statement is given.

The trial court deemed appellant's oral statement admissible since it contained the following assertions of facts or circumstances which were found to be true and conduced to establish his guilt:

1) The television set in the deceased's living room was connected to the cable outlet, but not plugged into the electrical outlet;

2) Food was found in appellant's girlfriend's car;

3) When the deceased was found, her clothing was arranged in the condition described by appellant in his oral statement;

4) The scratches on appellant's body were consistent with his oral statement; and

5) Anthony Harris verified the portion of appellant's statement describing his assistance to the appellant in pushing the deceased's automobile to the driveway at 14919 Delmack.

Appellant argues that these corroborating facts were already known to the police when the statement was made and it was therefore inadmissable.

As a general rule, oral confessions are not admissible. Article 38.22, § 3(a); *Briddle v. State*, 742 S.W.2d 379 (Tex.Cr.App.1987); *Jimmerson v. State*, 561 S.W.2d 5 (Tex.Cr.App.1978); *McGilvery v. State*, 533 S.W.2d 24 (Tex.Cr.App. 1976). However, Article 38.22(c), § 3(c), in effect at that time provided:

"Subsection (a) of this section (Art. 38.22) shall not apply to any (oral) statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the instrument with which he states the offense was committed."

The example given in Article 38.22, § 3(c), is illustrative only and not a limitation on the statements which conduce to establish guilt and shown to be true. *Briddle v. State*, 742 S.W.2d, at 388. "While some case law indicates that the oral confession or statement must lead to the recovery of items or information before the oral confession or statement is admissible, the statute plainly requires only that the statement assert facts or circumstances that are found to be true and which conduce to establish the guilt of the accused." *Port v. State*, 791 S.W.2d 103, at 106 (Tex.Crim. App.1990). Oral statements made by an accused need not lead to or result in the discovery of incriminating evidence so long as the requirements of the statutes are met. *Id.* Additionally, the statute places no limitation upon the manner in which the facts are found to be true. *Id.; Briddle v. State*, 742 S.W.2d at 388. For instance, the facts may be "*found to be true*" by a third party. *Briddle v. State*, 742 S.W.2d at 388.

 Subsequent corroboration of facts in an oral statement which were previously unknown will make an oral statement admissible. *Port v. State*, 791 S.W.2d 103, at 107. In *Port*, the defendant was arrested on June 8, 1984, under suspicion of murdering a postal carrier. *Port v. State*, 791 S.W.2d, at 105. At the time of his arrest, the body of the deceased could not be located. *Id.* During transportation to the police station, the defendant orally admitted shooting the deceased twice in the head. *Id.* While exiting the police car at the station, the defendant noticed a gun in the arresting officer's possession and identified it as the one he "used to kill her." *Id.*, at 106. The body of the deceased was not found until the following January. *Id.* A subsequent autopsy revealed that the deceased was shot twice in the head. *Id.* A ballistics test then established that the gun the defendant identified was the weapon from which the bullets were fired. *Id.* Thus, the autopsy and ballistics results verified or "found to be true" the facts from the defendant's oral statement. The statements were therefore deemed properly admitted. *Id.*, at 108. Since the assertions in the statement were unknown by the police

when they were made, were subsequently corroborated, and conduced to establish the defendant's guilt, we deemed that the statement was properly admitted. *Id.* "Implicit in this holding was the notion that 'found to be true' meant that facts about which the police are unaware at the time of the confession are later, after confession, found to be true." *Romero v. State*, 800 S.W.2d 539, at 544–545 (Tex.Cr.App.1990).

At least two of the assertions of fact made by the appellant in his oral statement revealed information which the police were unaware of prior to the statement. A limited investigation of the victim's apartment was made between 3:00 and 4:00 a.m. on Monday, February 24, 1986. During the early morning hours of Wednesday, February 26, 1986, appellant gave an oral statement to police in which he revealed that he intended on stealing the decedent's television on the night she was killed; however, he stated that when he was caught in the act of taking the television, he returned it to its initial location, plugging in the cable connection but not the electrical cord. The police then conducted a second search of the victim's apartment on the morning of Thursday, February 27, 1986. During the search, a photo was taken which revealed that the television was unplugged. This previously unknown fact was "found to be true" and established appellant's guilt. Additionally, this evidence went beyond the requirements of the statute since it resulted in the discovery of incriminating evidence. Although there is no indication that the police were aware that the television was unplugged during the first search of the victim's apartment, they would not have known the significance of this fact even had they noticed it.

Additionally, appellant told police in the oral statement that during the early morning hours of Saturday, February 22, 1986, Anthony Harris helped him attempt to start Ruth Deanda's car. He ultimately left the car in the driveway of a vacant house where he had killed the victim just hours before. Prior to the oral statement, the police did not know that Anthony Harris helped appellant push the car until ap-

pellant told them. Like the autopsy and ballistics report in *Port,* a subsequent police interview of Anthony Harris "found to be true" the facts in appellant's oral statement. This was therefore an assertion within his oral statement which was subsequently corroborated and conduced to establish appellant's guilt.

■ If but one of the assertions within a confession is found to be true and conduces to show the guilt of the accused, then the confession is admissible in its entirety. *Port v. State,* 791 S.W.2d, at 107; *Marini v. State,* 593 S.W.2d 709 (Tex.Crim. App.1980). In the instant case, at least two assertions of fact in appellant's oral statement were found to be true and conduced to establish his guilt. Cf. *Almanza v. State,* 839 S.W.2d 817, at 821 (Tex.Cr.App. 1992). We therefore need not address the remaining assertions which the trial court used to admit the statement. Accordingly, this point of error is overruled.

### VII.

In his ninth point of error, appellant argues that the trial court erred in submitting a charge to the jury that directed them to convict him of capital murder if they found he murdered the deceased while in the course of kidnapping or robbery. Appellant asserts that there was no evidence to support this charge. The analysis under point of error number one supports our holding that there was sufficient evidence to support this charge. Accordingly, appellant's ninth point of error is overruled.

Having considered each of appellant's nine points of error, we do not believe that any of them merit reversal of the judgment of the trial court. Appellant's conviction and his sentence of death are affirmed.

CAMPBELL, J., concurs in the result.

MALONEY, J., dissents.

CLINTON, Judge, dissenting.

### I.

I dissent first of all to the majority's disposition of appellant's third point of error in this cause, in which he complains that the trial court erred in granting the State's challenge for cause against venireman Frede. The majority holds that the trial court was justified in finding that Frede's "feelings" about the death penalty "may have prevented her from answering the statutory questions without conscious distortion or bias." At 444. The trial court, however, never made such a finding. In fact, it is apparent to me that the trial court believed assertions made by Frede that she could answer special issues honestly and in accordance with the evidence, even if her answers resulted in imposition of the death penalty. The trial court nevertheless granted the State's challenge for cause on the authority of *Ellis v. State,* 726 S.W.2d 39 (Tex.Cr.App.1986), for no other reason than that Frede opined that if given the opportunity to opt out of the distasteful duty to honestly answer the special issues, she would. In my view this cause demonstrates the distortion *Ellis* has created in the law.

### A.

Venireman Frede acknowledged she had "reservations" about the death penalty. Asked whether her reservations would cause her to answer one of the special issues "no" irrespective of evidence proving to her beyond a reasonable doubt they should be answered "yes," Frede at first equivocated, by which I mean she answered, "I don't know." Pressed for a more definite answer, she indicated she could not answer the questions in a way that would result in imposition of the death penalty. However, when the trial court questioned her, Frede apparently changed her tune, and from that point on maintained steadfastly that she could answer the special issues honestly and in accordance with the evidence. She later explained the apparent inconsistency to the prosecutor, thusly:

"Okay. Let me tell you what I understand about all this because it's plenty confusing. At first I thought that I was being asked that given the choice would I not be on this jury because of the death penalty, and I said I would not. Then

the other question I was asked was if I'm forced to be on the jury, even though I don't want to be on this kind of a jury, could I answer truthfully to those questions and the answer to that is yes."

And so she answered, without deviation, for the remainder of her voir dire.

In initially denying the prosecutor's challenge for cause, the trial court opined:

"... I think in every case when a juror expresses a personal prejudice against the law, the question then becomes can they set it aside for this trial. There are lots of laws jurors don't agree with; but when they take an oath to follow the law, can they follow the law where it says 'yes,' then they are qualified. This woman has stated a number of times now if she takes an oath as a juror to follow the law in Texas, if she believes beyond a doubt the answer to both of those questions should be 'yes,' she will answer them yes. She has stated if she takes an oath as a juror she will follow what the law is.

[Prosecutor]: She said she wouldn't take the oath—

THE COURT: In my mind jurors do not have a choice as to whether or not they want to take an oath."

I am on record as being in agreement with this last remark. *Hernandez v. State*, 757 S.W.2d 744, at 753 (Tex.Cr.App.1988) (Plurality Opinion). At any rate, at this juncture the trial court denied the State's challenge for cause, but agreed to look at any authority the prosecutor could muster over the lunch hour.

Immediately upon reconvening after lunch, the trial court again questioned venireman Frede:

"THE COURT: A couple more minutes, Dr. Frede. Just one question. You previously stated that if you took an oath to serve as a juror; if the State proved to you beyond a reasonable doubt that the defendant was guilty, you'd find him guilty; if the State proved to you beyond

a reasonable doubt that the answers to each one of these questions should be "yes" you would answer them 'yes.'

THE PANELIST: That is correct.

THE COURT: You've also previously stated that you would not want to take the oath as juror.

THE PANELIST: That's right.

THE COURT: All right. Understanding that there is no penalties in any way, shape or form for refusing to take an oath as a juror, if I were to ask you to stand up and swear you in and you can say I will refuse to take the oath and no problem, you refused. You can walk out of the courtroom, you know, no penalty, no consequences, no nothing. The only result is you would not serve as a juror. Based on what you have told us, if I were to ask you to stand up right now and to swear you to the following oath that you would a true verdict render according to the law and the evidence, what would be your response? Would you swear to the oath as a juror or would you say Judge, I'd like to—I will not take the oath.

THE PANELIST: If I'm given the choice I would say I would not take the oath.

THE COURT: Okay.

[PROSECUTOR]: The State would renew its challenge for cause.

THE COURT: That will be granted."

The prosecutor did indeed supply the trial court with authority during the lunch hour, *viz: Ellis v. State*, supra. There, as here, a venireman who said he would answer special issues honestly and in accordance with the evidence was challenged for cause because he acknowledged that he "would not want to" take an oath to "a true verdict render," Article 35.22, V.A.C.C.P., knowing it might force him, should the evidence dictate, to answer special issues in such a way as to cause imposition of the death penalty.[1]

---

**1.** Would we hold in a prosecution for robbery that a venireman who maintains he would not define the offense of robbery as the legislature chose to do in V.T.C.A.Penal Code, § 29.02, but would abide by the legislative definition if se-

lected to serve on the jury, would nevertheless be subject to challenge for cause because he also maintained that if given a choice, he simply would not take the Article 35.22 oath? There is

## B.

*Ellis* does not authorize granting of the challenge for cause in this cause. The reason the Court in *Ellis* held that a venireman's statement that he would prefer *not* to take the oath will support the granting of a State's challenge for cause is that it is *some* evidence that, despite assertions to the contrary, the venireman really will likely be so affected by his scruples against the death penalty as to consciously distort his answers to special issues. See 726 S.W.2d at 43–44. Obviously I have rejected this reasoning. *Id.*, at 51–53 (Clinton, J., dissenting). But even if I agreed with the *Ellis* majority that a mere preference not to take the oath is some evidence of a propensity to distort, I would reverse this cause.

A venireman who maintains he can follow the law should not be deemed subject to challenge for cause on no other ground than that he would prefer not to be put in that position, and would refuse if given that option. "The only reason for a juror to refuse to take the oath is if he *cannot* follow it." *Ellis v. State*, supra at 53 (Clinton, J., dissenting). See also *Hernandez v. State*, supra; *Farris v. State*, 819 S.W.2d 490 (Tex.Cr.App.1990) (Teague, J., dissenting). Clearly the trial court believed venireman Frede *could* follow the oath if she were to take it. Otherwise he would have granted the State's challenge for cause before the lunch recess. But, confronted with this Court's holding in *Ellis*, the trial judge nevertheless granted the State's challenge for cause. He did so *not* be-

cause he felt Frede's preference not to take the oath was an indication she could not discharge her duty honestly and without conscious bias or distortion. Clearly he believed she could. Rather, he did so because he believed that *Ellis* authorized the granting of the State's challenge for cause against Frede *solely* because she acknowledged that she would find that duty distasteful, and would avoid it if possible. Such a venireman has given no basis for a conclusion that he or she is "substantially impaired" under *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).[2]

The majority side-steps reversible error by deferring to a finding by the trial court that was never made. At 444–45. The trial judge here did not excuse Frede for cause because he regarded her preference not to take the oath as an indication she could not follow the law. The trial judge excused her because she preferred not to take the oath, period. Presumably even the majority in *Ellis* would not have endorsed such a rule.

I would hold that the trial court excused Frede upon an impermissibly broad basis under the Sixth and Fourteenth Amendments to the United States Constitution. Such error is not subject to a harm analysis. *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976); *Gray v. Mississippi*, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987). For this reason, if no other, the conviction should be reversed and remanded.

---

nothing intrinsic to the holding in *Ellis* that limits its application to capital voir dire issues.

**2.** The State argues appellant did not preserve error in that he failed to object to the trial court's grant of the challenge for cause. I disagree. Shortly before the court adjourned for the lunch break appellant announced:

"Could we have the record reflect we will object to the challenge in that it is a challenge based on the rationalization of the Supreme Court case of Adams and they are challenging her on an oath and not on whether or not she can be a fair and impartial juror based on her feelings about the death penalty."

In context it is clear appellant was thus objecting to the prosecutor's position that because Frede did not want to take the oath she was

disqualified, even though she had made it clear she could abide by the oath if she took it. This is precisely his argument on appeal. At no point after the lunch break did appellant ever say or do anything that would "create[ ] the distinct impression that he was abandoning his opposition to the motion to dismiss for cause." Compare *Purtell v. State*, 761 S.W.2d 360, at 366 (Tex.Cr.App.1988). On the contrary, he objected that the trial court sustained the challenge for cause without allowing him another opportunity to question the venireman. The trial judge was well aware that appellant opposed the challenge, and that he was ruling on a "contested" point. *Purtell*, supra. In my view appellant preserved error. See *Crane v. State*, 786 S.W.2d 338, at 345 (Tex.Cr.App.1990).

## II.

I also dissent to majority's disposition of appellant's seventh point of error. Appellant claims that Article 37.071, V.A.C.C.P., was unconstitutional as applied to him, in that the special issues did not account for the full significance of his mitigating evidence at the punishment phase of trial. I agree.

Appellant's evidence in mitigation is of the childhood abuse variety. In general outline it shows the following: As an infant he was left to fend for himself all night while his natural mother was at work. At age three-and-a-half his mother abandoned him. At that time he was still wearing diapers, had a diet consisting exclusively of hamburgers and french fries, and had not been toilet trained. He was adopted by parents whom appellant's teachers later suspected of sexually abusing him. His adoptive father disciplined appellant harshly, taking a strap to him, sometimes until he was bloody, and sending him to school unbathed and unfed as a form of punishment. His adoptive mother once punished him with a hot iron. He wore dirty, "worn out," ill-fitting clothes, and was subject to the disdain of his peers. Appellant developed behavioral problems, and there is some evidence he suffered from a hearing impairment and a learning disorder. One school authority testified appellant manifested "deep emotional problems." He spent time in and out of juvenile and foster facilities and was expelled from his adoptive home for good at the age of seventeen. He was only twenty when he committed the instant crime.

Appellant's evidence of disadvantaged background, history of family abuse, and emotional problems is at least as compelling, if not more so, as that presented by Penry himself. *Penry v. Lynaugh,* 492 U.S. 302, at 309, 109 S.Ct. 2934, at 2941–42, 106 L.Ed.2d 256, at 272 (1989). It is not likely that such evidence will have any bearing on the jury's answers to the special issues, unless it be to persuade jurors that appellant will in fact pose a probable future danger. Thus, appellant's evidence will have only an aggravating, not mitigating

tendency as it relates to the current Texas capital sentencing scheme. Yet, to allow no mitigating effect to this evidence runs counter to "the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh,* supra, 492 U.S. at 319, 109 S.Ct. at 2947, 106 L.Ed.2d at 278, quoting *California v. Brown,* 479 U.S. 538, at 545, 107 S.Ct. 837, at 841, 93 L.Ed.2d 934, at 942 (1987) (O'Connor, J., concurring).

Moreover, appellant's jury was precluded from giving any mitigating effect to the fact of his relative youth. In *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), a plurality of the Supreme Court invalidated the death sentence of a 21 year old defendant. Under the Ohio statute then governing capital sentencing, the trial judge was to impose a sentence of death unless he found one of three statutorily defined mitigating circumstances. Although various factors, including Lockett's age, could be considered in the determination whether any of the statutory mitigating circumstances existed, they could not be regarded as justifications in their own right for a sentence less than death. A plurality of the Supreme Court held that this limitation of the range of mitigating circumstances was incompatible with its recent Eighth Amendment jurisprudence, most notably *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). In a companion case to *Lockett, Bell v. Ohio,* 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978), the same plurality overturned the death penalty of a defendant who had been sixteen years old at the time of his offense.

In *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), a majority of the Supreme Court adopted the holding of *Lockett.* The Oklahoma capital sentencing statute provided for consideration of "any mitigating circumstances," and the trial judge did take Eddings' age, sixteen, into account in assessing the punishment. Thus the Supreme Court observed approvingly: "The trial judge recognized that

youth must be considered a relevant mitigating factor." 455 U.S. at 115, 102 S.Ct. at 877, 71 L.Ed.2d at 11. Because the trial judge declined to consider the troubled circumstances of Eddings' upbringing, however, his death sentence was also overturned, on authority of *Lockett*.

*Lockett*, *Bell* and *Eddings*, all supra, support the proposition that youth has Eighth Amendment relevance as mitigating evidence, quite apart from whatever bearing it may have on the statutory special issues.[3]

It is true that in *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), the Supreme Court held it was not cruel and unusual *per se* to impose the death penalty upon defendants who were sixteen or seventeen at the time of commission of the offense. This does not mean, however, that youth has lost its constitutionally mitigating significance. In *Penry* itself the Supreme Court held it is not *per se* unconstitutional to execute a mentally retarded capital accused. But in the same opinion the Supreme Court then insisted that mental retardation has mitigating significance beyond its relevance to the special issues under Article 37.071, supra. By the same token, that the Eighth Amendment does not categorically prohibit execution of youths and young adults does not reduce the significance of youth as a circumstance that in the individual case might justify a sentence less than death. Youth remains as an aspect of the individual character and circumstances of the offender which is a "constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. at 304, 96 S.Ct. at 2991, 49 L.Ed.2d at 961.

That aspect is not fully circumscribed by special issues. "The Eighth Amendment requires more than some consideration of mitigating evidence." *Graham v. Collins*, —— U.S. ——, ——, 113 S.Ct. 892, 925, 122 L.Ed.2d 260 (1993) (Souter, J., dissenting).

Appellant's jury was given no mechanism for expressing its reasoned moral response to this mitigating evidence, and to impose, should it choose to do so, a sentence less than death. *Penry v. Lynaugh*, supra, U.S. at 328, S.Ct. at 2952, L.Ed.2d at 284. I therefore agree with appellant that Article 37.071, supra, is unconstitutional as applied in his case, and he has been sentenced to death under circumstances violative of the Eighth Amendment. *Gribble v. State*, 808 S.W.2d 65, at 75 (Tex.Cr.App.1990). For this reason, also, the cause should be reversed and remanded. Because the majority does not, I respectfully dissent.

BAIRD, J., joins.

---

**3.** As I understand it, the recent opinion of the United States Supreme Court in *Graham v. Collins*, —— U.S. ——, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993), does not stand for the proposition that evidence of youth does not call for the additional instruction *Penry* held the Eighth Amendment required. *Graham* simply held that the precedent that dictated *Penry* did not necessarily dictate an additional mitigating instruction to accommodate evidence of youth, which may be given at least some mitigating effect in context of the second special issue. —— U.S. at ——, 113 S.Ct. at 902. Thus, to hold that evidence of youth requires an additional instruction beyond the statutory special issues would constitute a "new rule" for purposes of federal habeas corpus review, under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Because *Teague* bars application of a "new rule" on federal habeas corpus, the Supreme Court did not reach the merits of Graham's contentions. Whether the Supreme Court will ultimately adopt such a "new rule," holding as an extrapolation of *Penry* that evidence of youth *does* call for an additional instruction, in a petition for writ of certiorari to this Court following a direct appeal here, is a question that remains open.