# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00625-CR

**David Daniel Lauer, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
NO. 9014067, HONORABLE BOB PERKINS, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Appellant David Daniel Lauer appeals his conviction for capital murder. *See* Tex. Pen. Code Ann. § 19.03 (West 2003). Appellant's punishment is imprisonment for life. Appellant asserts that the evidence is legally and factually insufficient to support his conviction and that the trial court erred in failing to suppress evidence and in failing to grant a mistrial. We will affirm the judgment.

### Facts

In September 1999, appellant, seeking an employee for his business, contacted a trade school. As a result, appellant employed twenty-one-year-old Helen Frost, a recent graduate of that school. Helen Frost was employed on an hourly basis to do computer assisted drafting. She worked in her apartment, in appellant's office, and in appellant's trailer home.

Helen Frost shared an apartment with Amanda Garrett. Amanda worked with Sean Hackett and she introduced Sean to Helen. Helen and Sean dated and later Sean moved into the apartment with Helen and Amanda. Although Helen did not know it for some time, she learned that Sean had been convicted of possessing a controlled substance and was on probation. Also, Sean was using heroin. Helen was distressed, but she decided to try to help Sean. She helped him get into a methadone treatment program. Sean testified that he found Helen attractive "because she had such a clean life style." She was independent and thought she could take care of herself financially and physically. She worked more than one job in order to become financially independent; she had returned a credit card to her parents and asked them to discontinue putting money in her bank account. To feel more secure, she had taken a course in kick-boxing. Helen had expressed some concern about working for appellant because he flirted with her and he talked explicitly about his sexual relationship with his former wife. However, Helen had decided that the problem was not serious enough for her to terminate her employment with appellant. Helen's relationship with Sean became strained because Sean would not make a commitment to her; as a result, Sean moved to an adjoining apartment complex on Saturday, October 2, 1999.

On Tuesday evening, October 5, 1999, Helen and Amanda ate and watched television together. The young ladies had different schedules and Amanda did not see Helen before Helen left for work the next morning. At 8:26 a.m. on Tuesday, October 6, Callie Jo Castro, a secretary who answered phone calls for the tenants in the office building where appellant had an office, received a call from Helen Frost. Castro told Helen that appellant was not in his office. At about 8:30 a.m. the same morning, Helen had a telephone conversation with Sean, her estranged boyfriend. Helen

2

told Sean that she was going to appellant's house to pick up her check and to do some work. Helen and Sean agreed to meet at Helen's apartment at 3:00 p.m. that afternoon, after Sean finished work, to discuss resuming their relationship. That afternoon, when Sean went to Helen's apartment, she was not there.

When Helen Frost did not return to her apartment that Wednesday night, Amanda and Sean became concerned, but they decided she might have gone to her parents' home in Seguin. However, they thought it was very unlike her to leave town without telling them. Later in the evening, Amanda, Sean, and Helen's closest friend, Anna Roe, became so worried about Helen that Sean called Helen's father. James Frost, Helen's father, came to Austin. That Thursday evening, Amanda and Anna called appellant's phone numbers and left messages on his answering machines regarding Helen; Amanda and Anna also called a list of Helen's friends in an attempt to find her. All of Helen's friends returned their calls. However, appellant never returned the calls inquiring about Helen. When they were unable to get any information about where Helen might be, Helen's father and Sean contacted Travis and Hays County officials and reported that Helen was missing.

Late Thursday night and early Friday morning, Anna Roe and her husband drove from Austin to Dripping Springs and looked for Helen's car along the highway where Helen might have driven Wednesday morning. At about 1:00 a.m. Friday morning, by chance, Anna saw Helen's car parked on a grocery store parking lot. Helen's car was parked well away from the store in a poorly lighted area of the parking lot. Austin police were notified. Homicide Detective Richard Faithful met Helen Frost's family and friends where the car was found. The car was locked and Helen's purse was in plain view on the back seat floor board. Anna Roe obtained a spare key for the car at

3

Helen's apartment. Detective Faithful unlocked the car. Helen's wallet was in her purse. In the wallet, Detective Faithful found a card on which were appellant's cell, office, and home phone numbers. The detecive called each of the three numbers and left a message on the answering machines of two phones. In his message, the detective identified himself and told appellant that Helen Frost was last known to have been coming to work at his house and that she was now missing. The detective left his cell phone and pager numbers and asked appellant to call him, but appellant never returned the detective's calls.

On Friday morning, Sean went to the police station to give Detective Mark Gilchrest a statement, even though he knew he would be arrested for violation of probation. Sean provided the officers with hair and saliva samples for testing. Sean was in custody for several months because of his probation violation. While he was incarcerated, Sean identified a ring shown to him as Helen's ring. He had seen the ring the previous Saturday morning in Helen's apartment, before he left.

The Rogers family lived in the trailer park next door to appellant's trailer home. The Sanchez family lived across the street from appellant's trailer home. On Wednesday, October 6, teenaged school girls Lisa Rogers and Marissa Sanchez came home from school about 4:30 p.m. While they were out in the yard, the girls saw Helen Frost, red-faced, choked up, and crying as she came out of appellant's house. Appellant and Helen were arguing. Appellant raised his voice in a "mean" and "angry" manner and told Helen to "shut-up" and get in his pickup. She said, "No," but when appellant for the second time ordered her to get in the pickup, she did. Appellant drove away rather fast with Helen in his pickup. Helen's car was parked near appellant's house. Later that

4

evening, Helen's car was gone. Shelley Rogers and Yolanda Sanchez were also witnesses to most of the incident described by their daughters; the testimony of these women agreed substantially with their daughters' version of the incident.

After finding Helen Frost's car, officers commenced an investigation to find the missing young woman. On Friday, October 8, the officers were able to contact appellant; he agreed to talk with the officers at his trailer home. Appellant told the officers that he had last seen Helen Frost on Monday, October 4, or perhaps on the previous Friday. Appellant told the officers he had last talked to Helen Frost by telephone on Tuesday, October 5; at that time he said he told her to come to his trailer home on Wednesday to pick up some work, but that she did not come and get the work. While the officers were in appellant's trailer home, he gave them written consent to search the house. When the officers were about to search a chest of drawers in appellant's bedroom, appellant told them that they might find a ring that belonged to Helen which she had left in his bathroom.[1] The officers found the ring in the chest of drawers. Helen's friends identified the ring as Helen's. Appellant told the officers that he would not agree to come to the police station to make a statement at that time, but said he would do so on Monday morning, October 11.

---

[1] During the time that the officers were searching appellant's home on Friday, appellant called a friend, David Shepherd, and told him he was concerned about what the officers might find in their search.

Betty Crow, the assistant manager of a convenience store, knew appellant as a store customer. Also, Crow owned property adjacent to the trailer park where appellant lived. On Friday, October 8, 1999, at about 9:30 p.m. appellant came into the store. Appellant told Crow that officers had just searched his trailer home for about four hours. Appellant told Crow that the officers had questioned him about a young woman who had worked for him who was missing. He told Crow he thought the officers were watching him and that he was going to stay at an Austin hotel during the weekend. Appellant then asked Crow if he could trade trucks with her for the weekend. She told him no. Appellant asked Crow to come to the hotel where he was going to be staying on Saturday evening and have dinner with him. Appellant told Crow that the police might search her property. Appellant expressed no concern for his missing employee, Helen Frost. As appellant left the store, he saw officers in a car nearby. Appellant gave the officers his cell phone number and told them that he was going to stay in a hotel in Austin that weekend.

On Monday morning, October 11, at about 8:30 a.m., appellant came to the police station and was interviewed by Detective Gilchrest and a Texas Ranger.[2] The five and one-half hour interview was videotaped. After the interview, appellant left the police station. During the interview, appellant was clear about what he did and where he was on Monday, Tuesday, Thursday,

---

[2] Before Helen Frost's body was found, appellant was interviewed at the police station by Detective Mark Gilchrest and a Texas Ranger. This non-custodial five and one-half hour interview was videotaped and transcribed. The State did not offer in evidence either the videotape or the transcription. However, appellant offered and the court admitted the tape and the transcription in evidence "for purposes of the appellate record." The State in its brief notes and argues that during the interview the appellant told the officers that he enjoyed "choking sex" and that a partner could die from "choking sex." Because this evidence was admitted "for purposes of the appellate record" only, it was not in evidence before the jury and cannot be considered in the sufficiency of the evidence resolution.

6

and Friday, October 4, 5, 7, and 8, but with regard to Wednesday, October 6, appellant only remembered that he took his wife Dolly home from spending the night and then he went back to his home in Dripping Springs; appellant did not remember what else he did on Wednesday until the time he went back to Dolly's house on Wednesday night. Appellant had scratches and bruises on his arm, leg, and the back of his head and neck, which Detective Gilchrest photographed. Appellant said he did not know when he got the scratches, but he noticed them on Wednesday and thought he might have been scratched when he was fishing on Tuesday.

During the interview, appellant told the officers several times that he had a sexual relationship with Cheryl Cantrell. Appellant also discussed his sexual relationship with his wife Dolly who stayed with him on some nights but lived with her daughter.

In October 1999, the witness Cheryl Garcia, formerly Cheryl Cantrell, was a bookkeeper living in Round Rock. Cheryl was looking for another job, and a friend told her that appellant wanted to employ a bookkeeper. Cheryl called appellant and arranged for an interview at his home at 6:00 p.m. on Monday, October 4. After talking to appellant for about forty minutes, she decided she did not want the job. However, appellant told her he was interested in buying a lap top computer that Cheryl wanted to sell; it was agreed that appellant would come to Cheryl's apartment to examine the computer on the evening of October 5 or 6. On October 6, appellant called Cheryl and told her he had encountered some problems; he "sounded very strange, very distant, not businesslike." On October 7, appellant made arrangements to come to Cheryl's apartment to inspect and determine whether he wanted to buy her computer. Appellant did not buy the computer because Cheryl wanted more money for it than appellant wanted to pay. On Friday, October 8, appellant

7

called Cheryl; he was "very upset" and wanted her to "come and have dinner with him and to be seen with him" at the hotel where he was staying. Appellant told her that the police "had searched his home and had confiscated a lot of things." She did not have dinner with appellant. On Monday, October 11, appellant called Cheryl and told her the police would be contacting her. He told her not to tell the police about their meeting on the previous Monday night. Appellant told Cheryl that the police knew that they had met in her apartment on Thursday. He wanted her to tell the officers that he had had sex with her in her apartment on Thursday. Also, he wanted her to tell the officers that "he was a nice guy, that he was gentle." Cheryl became angry and told him she did not want to hear from him any more.

Appellant and David Shepherd had been close friends for ten years. On Wednesday, October 6, 1999 at about 7:30 p.m., Shepherd drove his white station wagon to appellant's home. Appellant was not at home and after about thirty minutes, Shepherd left. At a convenience store on the county line, Shepherd called appellant's cell phone number but without success. Shepherd left appellant a three-minute voice mail message and went on home. Phone records show that at 7:55 p.m. appellant, using his cell phone, called the pay phone from which Shepherd had called. Phone records also show that appellant made five calls to Shepherd's home late Wednesday night. Shepherd testified that both he and his wife talked to appellant.[3] During the weekend, appellant called Shepherd and his wife several times. Appellant was upset and wanted the Shepherds to come to the hotel where he was staying to have dinner and to talk with him. They did not do so.

---

[3] At trial, Shepherd denied that he had helped appellant hide Helen Frost's body.

8

On the night of October 6, 1999, appellant came to the home of his stepdaughter, Angel Renfroe, where his wife Dolly lived. Appellant appeared to be upset and agitated; he closed his eyes and looked very tired. At about 9:00 p.m., Angel asked appellant to take her to and drop her off at the Dallas Nightclub on Burnet Road. During the course of their conversation outside the night club, appellant told Angel that he wanted to spend a few days with her mother and then he planned to leave the "state or the country."

The record shows that appellant cashed a check for $3,000 dated October 6, 1999. On Thursday, October 7, workmen were installing an elevator in the building where appellant had his office. One of the workmen testified that he saw the appellant move several boxes from his office and load them into his pickup.

Shana Thompson, another of appellant's stepdaughters, had dated appellant before he married her mother, Dolly. Soon after appellant hired Helen Frost, he told Thompson on two occasions that he had hired a beautiful young girl that he was crazy about and that he wanted to know her sexually. Speaking of his new employee, appellant told Thompson that he wanted to tie her up; Thompson testified that this was "an inside joke between the two of us, you know, jokingly [he] stated he would like to tie her up."[4]

Kimberly Wygant and her fiancée had attempted, but failed, to sell some reptiles that belonged to appellant. Either when the snakes were consigned for sale or when they were returned to appellant, appellant had a conversation with Wygant in which he told her that he had just hired

---

[4] The joke was not further explained except in appellant's interview which was not in evidence before the jury.

a "sweet little thing." Appellant told Wygant that he wanted to have "relations" with the girl he had hired. Appellant had previously had other "sexually explicit conversations around" Wygant, and she understood that appellant was saying that he wanted to have "sexual relations" with his new employee.

When officers searched appellant's pickup, they found three unopened Trojan condom packages. During the search of the pickup, officers took swabs of three small spots that tested positive in a presumptive, but inconclusive, test for blood. Forensic specialists were able to generate a DNA profile from only one of the samples that came from the pickup bed. This DNA profile matched a known DNA profile of Helen Frost. The probability of finding this particular DNA profile was one in 22.2 trillion Caucasions. DNA material taken from a sexual assault kit swab obtained from the body found in the field also matched the known DNA profile of Helen Frost.

Evidence was offered that on Wednesday, October 6, appellant made eight cell phone calls before 9:00 a.m. Between 9:00 a.m. and 4:00 p.m., appellant made one cell phone call. That one minute call was made to Helen Frost's apartment. After 4:30 p.m. and before 10:11 p.m. that day, appellant made or received four calls from his wife Dolly, made or received six calls from David Shepherd or his wife, and made one pay phone call.

On Monday evening, October 11, 1999, while out for a walk, John Platt smelled the odor of something dead. He investigated and in a nearby maize field saw a body, "the legs of the torso and the upper part was a dark mass. I knew it was a body." Platt called the sheriff's office. Platt's house, about a mile away, was the closest house to the body. The body was naked laying on its back with the legs and knees bent upwards, the legs spread, in a posture which suggested that the

10

victim had been sexually assaulted according to Travis County Sheriff's Office Detective Jackson Lee Jonos. City of Austin Detective Mark Gilchrest testified that what he saw at the scene was consistent with someone having been raped and killed in that position at that place. Also, Detective Gilchrest testified that it was possible to kill someone by asphyxiation without leaving much blood. No clothing was found at or near the scene. Officers found and collected cans and other items near the body, including an empty Trojan condom package. The officers were unable to obtain any latent fingerprints from any of the items. The "decomposed and partially skeletonized" body was identified by tattoos, dental records, and later DNA, as the body of Helen Frost.

Dr. Elizabeth Peacock, Travis County Deputy Medical Examiner, testified as an expert witness using the autopsy report filed by Travis County Chief Medical Examiner Dr. Roberto Bayardo, his notes, and photographs. It was Dr. Bayardo's opinion, expressed in the autopsy report, that "based on the investigation of the circumstances and the autopsy findings that the decedent, Helen Frost, came to her death as a result of homicidal violence of undetermined type." Based on the decomposition and maggot infestation of the body, Dr. Peacock put the time of death in a range of between four and eight days. Dr. Peacock explained that in conducting the autopsy and in determining the cause of death, Dr. Bayardo had eliminated natural causes. Also, that Dr. Bayardo found no skeletal or soft tissue injuries. The level of ethanol found in the body was consistent with, and resulted from, the degree of decomposition present. Tests revealed no other drugs in the body. Dr. Peacock testified that death by asphyxiation "absolutely" could not be ruled out in this particular case and that asphyxial death could be caused by strangulation or hanging. Also, death by

11

asphyxiation "could be done without leaving any evidence of trauma to the brain or to the internal organs."

## The Charge and Standards of Review

Appellant was charged with intentionally causing the death of Helen Frost by asphyxiation in a manner and means unknown to the grand jury,[5] while in the course of committing or attempting to commit[6] the offense of aggravated sexual assault,[7] or while in the course of committing or attempting to commit the offense of robbery,[8] or while in the course of committing or attempting to commit the offense of kidnapping.[9]

---

[5] A person commits capital murder if he commits murder as defined under Section 19.02(b)(1) of the penal code and he intentionally commits the murder in the course of committing or attempting to commit kidnapping, robbery, or aggravated sexual assault. *See* Tex. Pen. Code Ann. § 19.03(a)(2) (West 2003). A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. *Id.* § 19.02(b)(1).

[6] A person commits the offense of criminal attempt if, with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended. If a person attempts an offense that may be aggravated, his conduct constitutes an attempt to commit the aggravated offense if an element that aggravates the offense accompanies the attempt. It is no defense to prosecution for criminal attempt that the offense was actually committed. *See* Tex. Pen. Code Ann. § 15.01(a)(b)(c) (West 2003).

[7] A person commits the offense of aggravated sexual assault if the person intentionally or knowingly causes the penetration of the anus or female sexual organ of another person by any means without that person's consent and if the person causes serious bodily injury or attempts to cause the death of the victim in the course of the same criminal episode. *See* Tex. Pen. Code Ann. § 22.021(a)(1)(A)(i), (2)(A)(i) (West 2003).

[8] A person commits the offense of robbery, if in the course of committing theft and with intent to obtain or maintain control of the property he intentionally, knowingly, or recklessly causes bodily injury to another. *See* Tex. Pen. Code Ann. § 29.02(a)(1) (West 2003).

[9] A person commits the offense of kidnapping if he intentionally or knowingly abducts another person. *See* Tex. Pen. Code Ann. § 20.03 (West 2003).

12

In proving capital murder, the State need prove only that appellant committed the murder while in the course of committing or attempting to commit one of the three alleged underlying felonies, either robbery, kidnapping or aggravated sexual assault. *See Gunter v. State*, 858 S.W.2d 430, 439-40 (Tex. Crim. App. 1993); *Pinkerton v. State*, 660 S.W.2d 58, 62 (Tex. Crim. App. 1983).

In reviewing the legal sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Patrick v. State*, 906 S.W.2d 481, 486 (Tex. Crim. App. 1995); *Aiken v. State*, 36 S.W.3d 131, 132 (Tex. App.—Austin 2000, pet. ref'd). The standard of review is the same whether the evidence is direct, circumstantial, or both. *See Kutzner v. State*, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999); *Banda v. State*, 890 S.W.2d 42, 50 (Tex. Crim. App. 1994); *Geesa v. State*, 820 S.W.2d 154, 158 (Tex. Crim. App. 1991). All of the evidence that the jury was permitted, properly or improperly, to consider must be taken into account in determining the legal sufficiency of the evidence. *Garcia v. State*, 919 S.W.2d 370, 378 (Tex. Crim. App. 1994); *see also Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993); *Rodriguez v. State*, 939 S.W.2d 211, 218 (Tex. App.—Austin 1997, no pet.).

Appellant asserts the evidence fails to establish beyond a reasonable doubt that the victim's death resulted from an intentional act or that he caused the victim's death. Moreover, appellant contends that the evidence is insufficient to show beyond a reasonable doubt that the

13

victim's death was caused by him while in the course of committing or attempting to commit the offenses of either robbery, kidnapping, or aggravated sexual assault.

The jury's verdict depends upon circumstantial evidence. It appears that the victim Helen Frost was a healthy, independent, self-reliant, twenty-one-year-old woman on the evening of Tuesday, October 5, 1999, when she watched television with Amanda Garrett. The victim's telephone calls to appellant's secretary and Sean Hackett early Wednesday morning showed her intent that day was to go to appellant's house to obtain her check, do some work, and to return to her apartment by 3:00 p.m. At approximately 4:30 p.m. that day, four witnesses saw the victim come out of the appellant's house crying and obviously in distress. Appellant was angry and he verbally coerced his employee, even though she protested, to get in his pickup; appellant then took her away, leaving her car behind. There is no evidence that anyone other than appellant saw the victim alive after that time.

On October 11, 1999, five days later, Helen Frost's unclothed, maggot infested, decomposing body and an empty Trojan condom package were found in an isolated maize field. The position of her body between the rows of maize stubble suggested that she had been sexually assaulted and murdered where her body was found. On Friday, October 8, when they searched appellant's house, the officers noticed scratches on appellant's arm, leg, and neck that would have been consistent with having been inflicted by maize stubble or a defensive struggle.

On Friday, October 8, appellant told the investigating officers that he had not seen the victim since Monday, October 4, or on the preceding Friday, October 1; appellant apparently lied. Four witnesses saw appellant with the victim on Wednesday evening, October 6. Two witnesses

14

testified that soon after appellant hired the victim, appellant expressed his desire to have sexual relations with the victim and to one of the witnesses he expressed his desire to tie up the victim.

On Monday, October 11, officers found in the bed of appellant's pickup three unopened Trojan condom packages and traces of some body fluid. From one of the traces of body fluid, DNA material extracted matched the victim's DNA profile. The medical examiner ruled that the victim came to her death as a result of homicidal violence of an undetermined type.

In addition, there is more circumstantial evidence. When Detective Faithful and the victim's friends left messages on appellant's telephone answering machines that his employee was missing, appellant did not return the calls. Appellant never expressed any concern for his missing employee. After officers searched appellant's house and when he thought he was being followed by officers, appellant attempted to get an acquaintance to trade trucks with him. In his October 11 interview with officers, appellant told them he had a sexual tryst with a young woman on Thursday, October 7. After the interview, appellant called the young woman and told her to tell the officers that they had had a sexual encounter that evening and that appellant had been nice and gentle. The young woman, whom appellant had just met, testified that she and appellant did not have sexual relations.

The victim's car, which had been parked at appellant's house when he left with her, was found in an isolated part of a grocery store parking lot. The victim's ring, which had been in the victim's apartment on Saturday, October 2, was found hidden in a drawer in appellant's bedroom on October 8. This evidence contradicted appellant's explanation for the ring being in his possession.

15

Appellant cashed a check for $3,000 dated October 6, 1999. In the late evening of October 6, appellant told his step-daughter that he intended to leave the state or the country soon. On Thursday, October 7, appellant moved several boxes from his office and loaded them into his pickup.

When the cumulative, combined circumstantial evidence is viewed in the light most favorable to the prosecution, the evidence supports a rational finding that the essential elements of the offense charged were proved beyond a reasonable doubt. The evidence is legally sufficient to support the jury's verdict. Appellant's first point of error is overruled.

## Factual Sufficiency

In his second point of error, appellant insists that the evidence is factually insufficient to support his conviction for capital murder. Appellant quite correctly argues that evidence which may be legally sufficient to sustain a conviction may nevertheless be factually insufficient. In determining factual sufficiency of the evidence, the reviewing court must consider and take a neutral view of all of the evidence, reversing the judgment if: (1) the evidence demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the fact finder's determination, or (2) the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *See Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 410 (Tex. Crim. App. 1997); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). When a jury's verdict depends primarily on its evaluation of the witnesses' demeanor and credibility, it deserves almost total deference. *Johnson*, 23 S.W.3d at 8-9; *Cain*, 953 S.W.2d at 408-09.

16

Although the defense presented no evidence, we must apply the factual sufficiency standard of review to all of the evidence in the record. In his argument under this point of error, appellant relies upon the same evidence, or the asserted lack of evidence, that he relied upon in his argument on legal insufficiency.

The jury is the exclusive judge of the facts, of the credibility of the witnesses, and the weight to be given their testimony. *See* Tex. Code Crim. Proc. Ann. art. 36.13 (West 1981); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). Reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Margraves*, 34 S.W.3d at 919. The jury may accept portions of a witness's testimony and reject portions of the testimony. *Id.*; *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986).

After neutral consideration of all of the evidence and giving proper deference to the jury's verdict, we conclude that the evidence of appellant's guilt is not so weak as to undermine confidence in the jury's determination, nor is proof of guilt greatly outweighed by contrary proof. The evidence is factually sufficient to support the jury's verdict. Appellant's second point of error is overruled.

### Suppression of Evidence

In his third point of error, appellant urges that the trial court "erred in overruling appellant's motion to suppress the evidence from the search of his vehicle." Appellant argues that

17

the affidavit supporting a search warrant fails to establish probable cause. In view of the record, we are unable to determine whether there is merit in appellant's contention. The record does not include either a search warrant or a supporting affidavit; therefore, nothing is presented for review. *See Bentley v. State*, 520 S.W.2d 390, 394 (Tex. Crim. App. 1975); *Prudhomme v. State,* 495 S.W.2d 941, 943 (Tex. Crim. App. 1973); *Townsend v. State*, 481 S.W.2d 855, 856 (Tex. Crim. App. 1972); *Satillan v. State*, 470 S.W.2d 677, 678 (Tex. Crim. App. 1971); *Walsh v. State*, 468 S.W.2d 453, 454 (Tex. Crim. App. 1971). Appellant has attached to his appellate brief purported copies of a warrant and supporting affidavit. We are unable to consider these attachments to appellant's brief because they are not part of the record. Appellate courts "will not consider documents attached to appellate briefs as part of the record on appeal." *Harris v. State*, 453 S.W.2d 838, 839 (Tex. Crim. App. 1970); *see also Young v. State*, 552 S.W.2d 441, 443 (Tex. Crim. App. 1977); *Booth v. State*, 499 S.W.2d 129, 135 (Tex. Crim. App. 1973); *Anderson v. State*, 445 S.W.2d 752, 754 (Tex. Crim. App. 1969); *Brown v. State*, 866 S.W.2d 675, 678 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd); *Gipson v. State*, 669 S.W.2d 351, 353 (Tex. App.—Fort Worth 1984, no pet.). Even if a search warrant and a supporting affidavit were included in the record, appellant would have another insurmountable problem. Appellant has not identified in his brief any evidence seized by authority of the purported warrant that should have been suppressed and not admitted in evidence. Moreover, if any evidence was seized and admitted in evidence, appellant has failed to direct our attention to the place in the record where he objected to the admission of that evidence on grounds that it had

18

been unlawfully seized; therefore, nothing is presented for appellate review.[10] *See Louis v. State*, 61 S.W.3d 593, 598-99 (Tex. App.—Amarillo 2001, pet. ref'd); *Fain v. State*, 986 S.W.2d 666, 681-82 (Tex. App.—Austin 1998, pet. ref'd). Appellant's third point of error is overruled. There was no pretrial hearing on appellant's motion to suppress. Although the trial court and counsel referred to the suppression hearing as a pretrial hearing, the hearing was conducted after two days of trial testimony near the end of the trial. Appellant's third point of error is overruled.

## Mistrial Claim

In his fourth point of error, appellant complains that the trial court erred in failing to grant a mistrial after the State's witness informed the jury that appellant was on probation. On direct examination, Detective Mark Gilchrest testified:

Q. And then he's saying that that night he went to Dolly's house and they ate pizza and then they returned to Dripping Springs?

A. Yes, sir.

Q. That's Wednesday, correct?

A. That's correct.

---

[10] Appellant was allowed to file a post-submission letter brief. In that letter brief, appellant refers us to the portions of the record in which he says the "trial judge's rulings on various motions occurred." Within the specified portions of the record, no evidence allegedly seized by authority of the purported search warrant was identified, offered, or admitted in evidence, and within the specified portion of the record we find no objections to the admission of any specific evidence allegedly seized.

19

Q. Did he tell you what he did on Thursday?

A. Mr. Lauer stated that on Thursday he was at home until around noon.

Q. I'm sorry. Did he indicate Dolly was with him?

A. Dolly was with him, that's correct. He and Dolly went to Mr. Lauer's office there in Dripping Springs to meet his probation officer.

MR. DAVIS: Objection, Your Honor. May we - -

THE COURT: I'll sustain the objection. I'll instruct the jury to disregard the last remarks of the witness.

(Outside the hearing of the jury:)

MR. DAVIS: I move for a mistrial, Your Honor.

THE COURT: I'll overrule that.

Mistrial is a remedy appropriate for a narrow class of highly prejudicial and incurable errors. *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). Ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer, even one regarding extraneous offenses. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). A trial court's denial of a mistrial is reviewed under an abuse of discretion standard. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). In this case, the prosecutor did not ask an improper question. The witness's answer was non-responsive. The trial court promptly sustained the defense's objection and before requested to do so, admonished the jury to disregard the remarks of the witness. The trial court did not abuse its discretion in overruling appellant's motion for a mistrial. Appellant's fourth point of error is overruled.

20

The judgment is affirmed.

_____

Carl E. F. Dally, Justice

Before Justices Kidd, B. A. Smith and Dally[*]

Affirmed

Filed:   May 30, 2003

Do Not Publish

[*]   Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).